FILED & ENTERED

SEP 04 2012

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re:<br><br>Orange County Nursery, Inc.<br><br><br><br><br>Debtor(s). | Case No.: 1:09-bk-22100-GM<br><br>Chapter 11<br><br>**MEMORANDUM OF OPINION REGARDING THE TREATMENT AND VALUATION OF THE CLAIM OR INTEREST OF THE MINORITY VOTING TRUST [DOCKET 592 ]**<br><br>Date:   July 31, 2012<br>Time:   10:00 a.m.<br>Place:  Courtroom 303 |

   This valuation arises from a dissolution action of the Debtor corporation. Pursuant to Cal. Corp. Code §2000, on November 21, 2008, after extensive litigation, the Superior Court entered a value of the Minority Voting Trust's interest (hereafter "Minority") in the amount of $4,906,475, plus interest to the date of judgment for a total of $5,249,928. This represented 40.25 percent of the total value of the Debtor corporation.[1]  Once that was determined, the Debtor could either pay that amount or liquidate. This ruling was appealed by the Majority.[2]

---
[1] Veyna v. Orange County Nursery, Inc., Orange County Superior Court Case 06 CC 08763.
[2] Veyna et. al. v. Orange County Nursery Inc. et al., G041305, filed 12/8/08. This appeal is still pending, although it has been stayed by the filing of the bankruptcy

-1-

The Majority failed to obtain a stay from the Court of Appeal and on January 22, 2009, just before the time to pay the purchase price, it filed this bankruptcy case. The Minority filed claim #73 on May 14, 2009, asserting a liquidated total of $6,008,424.75 ($5,249,928 per the Superior Court judgment and $758,496.75 in pre-petition legal fees), and it also noted that it was claiming an amount to be determined for post-petition fees under Cal. Corp. Code §2000(c).

In the first amended plan, the Debtor classified the Minority as an equity holder, who would receive nothing under the plan. I agreed with this classification, which the Minority appealed. Later the confirmation order and the objection to claim were also appealed to the District Court and were combined in one ruling, which was favorable to the Minority.[3] The Debtor then appealed to the Ninth Circuit, which dismissed that appeal as interlocutory, noting that "the bankruptcy court has not yet had the opportunity to exercise its fact-finding power and value the claims at issue; by dismissing the appeal, we avoid addressing the legal questions on an underdeveloped record."[4]

While this Court wishes that the Ninth Circuit would have resolved the critical legal issue of whether the status of the Minority is that of a holder of an unsecured claim or whether it holds a equity interest (which probably would have resolved all of the other issues), this did not occur. So, once again, the Debtor seeks an order that the Minority holds an equity interest and is not an unsecured creditor, but with a new twist. The Debtor argues that the effect of the Dissolution Order and the District Court Order is to create a forced purchase and this is controlled by 11 USC §510(b), which subordinates this claim to the same priority as that of common stock.[5] This issue was not dealt with

---

[3] The Minority Voting Trust v. Orange County Nursery, U.S.D.C., CA(C) DMG, CV 09-08158 DMG, CV 10-1605, and CV 10-05808 DMG.
[4] Orange County Nursery, Inc. et. al v. The Minority Voting Trust, et al, 10-56775 (doc. 45-1).
[5] Brief of Orange County Nursery, Inc. re Procedure for Valuing Minority Claim (doc. 613).

in the District Court Opinion, which concerned my prior ruling that the classification of the Minority's interest depended on whether the right to payment had matured or become non-contingent prior to the filing of the bankruptcy. Whether the District Court was correct on its ruling as to the effect and timing of maturity will have to await resolution by the Ninth Circuit at some later date.

### Does 11 USC §510(b) Require that the Minority Claim Be Treated As If It Were Common Stock?

Section 510(b) of the Bankruptcy Code provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 [11 USCS § 502] on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. §510(b).

The question is whether the Dissolution Order and the District Court Order have created a forced purchase, thus calling §510(b) into action.

Ninth Circuit and Other Courts of Appeal Decisions

Decisions in the Ninth Circuit interpreting §510(b) start with <u>Am. Broad. Sys. v. Nugent (In re Betacom)</u>, 240 F.3d 823 (9TH Cir. 2001). While the facts of <u>Betacom</u> are not directly analogous to the present case (claim for damages under merger agreement pursuant to which target/debtor shareholders should have received stock of acquirer/debtor but did not; claim against acquirer in jointly administered cases), <u>Betacom</u> has been widely cited for the Ninth Circuit's expansive reading of §510(b). In

deciding to subordinate the claim under §510(b), the court stated that §510(b) was not limited to cases of shareholder fraud, that the subordinated claimant need not actually be a shareholder and that an actual sale of a security is not required.  <u>Betacom</u>, 240 F.3d at 828-31.  The court's decision rested on the policy behind §510(b):

> Section 510(b)'s legislative history does not reveal an intent to tie mandatory subordination exclusively to securities fraud claims. Congress relied heavily on the analysis of two law professors in crafting the statute. See H. Rep. 95-595, at 195 (1977) (explaining that the argument for mandatory subordination is best described by Slain & Kripke, The Interface Between Securities Regulation and Bankruptcy--Allocating Risk of Illegal Securities Issuance Between Security holders and the Issuer's Creditors, 48 N.Y.U. L. Rev. 261 (1973)) . . . .  According to Slain and Kripke, the dissimilar expectations of investors and creditors should be taken into account in setting a standard for mandatory subordination. Shareholders expect to take more risk than creditors in return for the right to participate in firm profits. The creditor only expects repayment of a fixed debt. It is unfair to shift all of the risk to the creditor class since the creditors extend credit in reliance on the cushion of investment provided by the shareholders.
> ….
> In determining whether or not an actual sale or purchase is required for mandatory subordination, we must examine the reasoning behind § 510(b). There are two main rationales for mandatory subordination: 1) the dissimilar risk and return expectations of shareholders and creditors; and 2) the reliance of creditors on the equity cushion provided by shareholder investment.
> The first rationale applies even if there is no "actual" sale or purchase. Before they receive any stock or extend a line of credit, investors and creditors have different expectations. Even if an investor never receives her promised shares, she entered into the investment with greater financial expectations than the creditor. The creditor can only recoup her investment; the investor expects to participate in firm profits. The House Report on § 510 follows this logic:
>> Placing rescinding shareholders on a parity with general creditors shifts the risk of an illegal stock offering to general creditors. The general creditors have not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities and it is inequitable to permit shareholders that have had this potential benefit to shift the loss to general creditors.
> H. Rep. 95-595 at 195; U.S. Code. Cong. & Admin. News 1978, at 6156.
> The second rationale for not allowing shareholder claimants to take priority over creditor claimants is that creditors may rely on the funds contributed by the shareholders in assessing the risk of their loan to the debtor. The legislative history of § 510 specifically notes this argument in the Slain and Kripke article  . . . .

<u>Betacom</u>, 240 F.3d at 829-830.

The Ninth Circuit decided a subsequent case under §510(b), <u>Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.)</u>, 493 F.3d 1067 (9th Cir. 2007), in which it restated its expansive reading of §510(b), but declined to subordinate a claim under

-4-

§510(b). The claimant was not a shareholder and had not contracted to be a shareholder; he had merely contracted to be paid for his services on the basis of share price.

Several other Courts of Appeals have also adopted expansive readings of §510(b), in each case concluding that the language of §510(b)("arising from the purchase or sale") is ambiguous and turning to legislative history and policy considerations, just as the Ninth Circuit did in Betacom. In Allen v. Geneva Steel Co. (In re Geneva Steel Co.), 281 F.3d 1173 (10th Cir. 2002), the Tenth Circuit subordinated a shareholder's "fraudulent retention" claim (that debtor's fraud caused the shareholder to retain shares). The court concluded that §510(b) bars claims arising from the purchase or sale of a security and "is not limited to issuance related claims." Id. at 1182. In Baroda Hill Inv., Inc. v Telegroup, Inc. (In re Telegroup, Inc.), 281 F.3d 133 (3$^{d}$ Cir. 2002), the Third Circuit subordinated shareholder's breach of contract claims based on the debtors' failure to use their best efforts to ensure stock was registered and freely tradable. The court declined to distinguish claims based on actionable conduct occurring after purchase of the security from claims based on actionable conduct occurring at the time of the purchase. In Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251 (2d Cir. 2006), the Second Circuit subordinated a breach of contract claim by a former employee for debtor's failure to issue its shares: "we interpret section 510(b) broadly to require subordination of the claim at issue." Id. at 259.

The Fifth Circuit's decision in SeaQuest Diving, LP v. S&J Diving, Inc. (In re SeaQuest Diving, LP), 579 F.3d 411 (5th Cir. 2009) is the most factually similar Court of Appeals decision to the Orange County Nursery one, because it subordinated a claim based on a state court judgment enforcing a contract for the debtor to repurchase

partnership interests in itself.  However, the SeaQuest Diving contract "rescinded" the claimants' purchase of partnership interests.  The Fifth Circuit distinguished this rescission-based claim, which was subject to §510(b) subordination, from a claim based on redemption of ownership interests, which *might* not be.  (The opinion examined several decisions refusing to subordinate promissory notes issued by debtors to repurchase their own stock, Schoeberl v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 272 B.R. 836, 844-45 (Bankr. D. Del. 2001), abrogated on other grounds by Telegroup, 281 F.3d at 142; Official Comm. of Unsecured Creditors v. Am. Capital Fin. Servs. (In re Mobile Tool Int'l, Inc.), 306 B.R. 778, 782 (Bankr. D. Del. 2004), which are discussed below, but declined to speak to whether they were correctly decided.  SeaQuest, 579 F.3d at 423.)  The Fifth Circuit focused on the underlying nature of a claim:

> We reject S&J's argument that "the equitable nature of a claim is lost once it is converted to a ... judgment." If the court could not look behind the judgment, then subordination of a rescission or tort claim based on securities fraud (which clearly falls within the purview of § 510(b)) would depend upon whether the claimant obtained a pre-petition judgment on the claim. We doubt that Congress intended such a result, which is contrary to the text and legislative history of the statute.

Id. at 425.

While these Circuit decisions are not on all fours with the instant case, they share an expansive reading of §510(b) and set the ground rules for interpreting the statue.  The Fifth Circuit's summary is particularly instructive:

> For purposes of the damages category, the circuit courts agree that a claim arising from the purchase or sale of a security can include a claim predicated on post-issuance conduct, such as breach of contract. See Telegroup, 281 F.3d at 140, 142. They also agree that the term "arising from" is ambiguous, so resort to the legislative history is necessary. See id. at 138; Geneva Steel, 281 F.3d at 1178; Med Diversified, 461 F.3d at 255. For a claim to "arise from" the purchase or sale of a security, there must be some nexus or causal relationship between the claim and the sale. See Telegroup, 281 F.3d at 138. Further, the fact that the claims in the case seek to recover a portion of claimants' equity investment is the most important policy rationale. See id. at 142; Geneva Steel, 281 F.3d at 1179. "When an investor seeks *pari passu* treatment with the other creditors, he disregards the absolute priority rule, and attempts to establish a

contrary principle that threatens to swallow up this fundamental rule of bankruptcy law."  [In re Granite Partners, L.P., 208 B.R. 332, 344 (Bankr. S.D.N.Y. 1997]. When a claimant elects to take an equity stake in the debtor, he becomes bound by the choice to trade the relative safety of a fixed return for the "upside potential of shareholder status." Med Diversified, 461 F.3d at 256.  SeaQuest, 579 F.3d at 421-422.

Under this expansive interpretation and these ground rules, the Minority's claim should be subordinated.  There is the required causal relationship between the claim and the purchase/sale of stock: the claim is payment from the sale of the Minority's share of the equity.  The "underlying nature" of the claim is the recovery the Minority's equity investment and the disregard of the absolute priority rule, triggering "the most important policy consideration" behind §510(b): equity should not be able to recover its investment *pari passu* with creditors and disregard the absolute priority rule.

Another Stock Repurchase Case

Weissmann v. Pre-Press Graphics Co. (In re Pre-Press Graphics Co.), 307 B.R. 65 (N.D. Ill. 2004), is a District Court decision on similar facts.  The court subordinated a shareholder's claim under a court order requiring debtor to repurchase 500 of its shares at a court determined "fair value" of $1,383,500 (as a remedy for breach of fiduciary duty and shareholder oppression).  Like the Courts of Appeals, the Pre-Press Graphics court concluded that the statue was ambiguous, looked at policy considerations, adopted a broad reading of the statute and required a "causal link" between the claim and the purchase or sale of the stock, but that causal link need not arise contemporaneously with the purchase or sale.  The court concluded that the claim arose from the debtor's oppressive conduct that was remedied with the judgment, which was causally linked to the purchase or sale of debtor's stock.  "In proposing what later became § 510(b), [Slain and Kripke] sought to prevent a disaffected shareholder from

recouping his or her investment ahead of unsecured creditors. In the court's view, that is exactly what [the claimant] is trying to do here." Pre-Press Graphics, 307 B.R. at 79.

Like the claimant in Pre-Press Graphics, the Minority are disaffected shareholders seeking to recoup their investment at the expense of unsecured creditors. Section 510(b) was created to subordinate just such disaffected shareholders seeking to end run the absolute priority rule and recoup their investment in the debtor ahead of other shareholders and *pari passu* with creditors.

Promissory Note Cases

One line of cases, primarily from the District of Delaware, has held that claims arising out of a promissory note issued prior to the petition date in exchange for stock, are not subject to §510(b) subordination: Wu v. Stephen H. Swift Trust (In re Swift Instruments, Inc.), 2012 WL 762833 (9th Cir. BAP Mar. 8, 2012); In re Montgomery Ward Holding Corp., 272 B.R. 836, 844-45 (Bankr. D. Del. 2001), abrogated on other grounds by Telegroup, 281 F.3d at 142; In re Mobile Tool Int'l, Inc., 306 B.R. 778, 782 (Bankr. D. Del. 2004).  The U.S. District Court for Delaware has extended this reasoning to a pre-petition judgment ordering the debtor to repurchase its stock from a shareholder.  Burtch v. Gannon (In re Cybersight), 2004 WL 2713098 (D. Del. 2004). The reasoning of these cases is that the note or the judgment extinguished the claimant's right to participate in profits.  Once the shareholder became a creditor, the rationales behind §510(b) -- dissimilar risk and return expectations of shareholders and creditors and the reliance of creditors on an equity cushion -- no longer applied to justify subordination.

These promissory note cases seem premised on the issuance of a tangible debt instrument. Mobile Tool court distinguished In re Alta+Cast, LLC, 301 B.R. 150 (Bankr. D. Del. 2003), where claim against debtor for failure to purchase its stock from former employee was subordinated under §510(b), because no debt instrument had ever issued. Mobile Tool, 306 B.R. at 782.

In the Ninth Circuit B.A.P. decision in Swift, the debt instruments were several promissory notes that had been issued by debtor between 1997 and 2003 under a 1952 agreement requiring the debtor to repurchase its shares upon the death of certain shareholders. The B.A.P. upheld the bankruptcy court's decision not to subordinate these notes in a bankruptcy case commenced in 2006. In doing so, the court characterized the Ninth Circuit decision in Betacom as holding that a promissory note claim may be subordinated under §510(b) but not specifying what circumstances justify subordination. The B.A.P. then determined that the noteholders at issue in Swift held only the risk and return expectations of creditors and that no creditors had relied on the equity that had been replaced by the notes in deciding whether to grant credit to the debtor.

This Court declines to apply the reasoning of these decisions to this case, primarily because the Minority shareholder's "claims" are quite different from the promissory notes and the judgment in these decisions. In each of these decisions, the claimant had received a tangible debt instrument (or judgment, in Cybersight) effectuating an exchange of equity for a sum certain obligation. Each claimant released its equity in exchange for debt: they had irrevocably traded the risks and rewards of equity for the risks and rewards of debt. (This is particularly essential to the Swift case, where the exchanges had occurred as many as nineteen and no fewer than three years

prior to bankruptcy.)

The judgment in this case does not purely trade equity for debt.  It provides that the Minority will receive *either* the payment specified in the judgment *or* their share of the proceeds of dissolution.  If the debtor does not make the payment specified in the judgment, the Minority will be equity holders.  So while the judgment may have given rise to a "claim," these claimants continue to have some expectation of sharing in the risks and rewards of the debtor as equity.  Furthermore, creditors undoubtedly relied on the Minority's participation in the Debtor as 40.25% equity, rather than as the holder of a multi-million dollar claim.  The rationales behind §510(b) continue to apply in this case to justify subordination.

Even if the facts of this case were to fit the Delaware theory, these decisions are inconsistent with the broad interpretation of §510(b) by the Ninth Circuit in Betacom, and the other Courts of Appeals that have considered §510(b).  These courts look at the underlying nature of the claim and have required only a causal connection between the claim and the purchase of stock.   The fact that a claimant may have obtained a pre-petition note or a judgment on account of that equity interest does not change the fact that the claim arose out of the sale of an equity security and does not negate the fundamental unfairness of allowing some shareholders to elevate themselves at the expense of creditors and other shareholders.   (As the Fifth Circuit noted, if a pre-petition judgment renders §510(b) inapplicable, then securities fraud claims could be exempted from §510(b) subordination simply by obtaining a pre-petition judgment, which is "contrary to the text and legislative history of the statute."  SeaQuest, 579 F.3d at 425.)

**Valuation of the Minority's Claim**

The subordination of the Minority's claim under §510(b) renders the issues of valuation irrelevant because equity will not receive any recovery under the Debtor's plan. However since an appeal is certain and this case has already been dealt with in a piecemeal fashion, the Court will rule on these issues at this time.

Two issues are raised as to the valuation procedure for the Minority's Claim. First is the date of the valuation. Second is the method. As to the method, the Debtor asserts in its state court appeal that the Superior Court failed to consider costs of sale and taxes on that sale. But it also argues before this Court that even if the valuation date used by the Superior Court is the correct one, the Bankruptcy Court must reevaluate the Superior Court order to take these items into account.

What is the Valuation Date of the Minority Claim?

The Minority argues that the value of its claim should be measured under §502(b) as of the date of the filing of the petition, since it arises from a prepetition judgment, which was a contingent unliquidated claim. Once the sixty day extension granted by 11 USC §108 expired, the Minority's claim was no longer contingent and since it could easily by mathematically calculated it also was no longer unliquidated. Nonetheless it must be estimated under §502(c)(2) for purposes of allowance under the plan because the Minority's right to payment arises from a right to an equitable remedy due to the Debtor's breach of performance. And the date for such estimation is the petition date.

The Debtor argues that because the claim is to be the same priority as common stock, it must be valued as of the confirmation date (February 18, 2010) to determine

-11-

whether the plan violates the absolute priority rule, since this is a plan in which that rule is applicable. It states that the petition date is not the correct date because this is not a typical unsecured claim since the claim arises from Cal. Corp. Code §2000 which deals solely with its equity status and the forced repurchase of its shares. And even though the District Court ruled that the Minority held a "claim," it did not exclude the fact that the claim arose from the Minority's equity interest since - but for the equity interest - there could be no claim by the Minority.

The Court agrees with the Minority that its claim should be valued as of the Petition Date. Bankruptcy Code §502(b) is crystal clear that the amount of unsecured claims should be determined "as of the date of the filing of the petition." 11 U.S.C. §502(b). Accordingly, the estimation of claims under §502(c) should be as of the petition date. *See, e.g.,* In re Fed-Mogul Global Inc., 330 B.R. 133, 155 (Bankr. D. Del. 2005); Eagle-Picher Indus., Inc., 189 B.R. 681, 682 (Bankr. S.D. Ohio 1995)("This is not a complicated question.").

The cases cited by the Debtor in support of a confirmation date valuation are inapposite. The cases cited by the Debtor in its most recent brief used a confirmation date valuation of the debtor for §1129 purposes -- not for determining or estimating a claim under §502. The Debtor cites Beneficial Homeowner Serv. Corp. v. Moreau (In re Moreau), 140 B.R. 943 (N.D.N.Y. 1992) for the proposition that the court should take note of changes in the economy and conduct a new valuation if warranted. But Moreau, like some cases cited previously by the Debtor as authority for a confirmation date valuation, concerned secured claims and collateral. To the extent the Minority has claim, it is undisputedly unsecured and governed by §502. The Debtor has not cited any authority for its argument that the claim's origins in equity somehow exempts it from

-12-

the clear mandate of §502(b).  Without any applicable authority to the contrary, the claim must be measured as of the petition date, pursuant to §502.

How is the Value to be Computed?

The Debtor argues that the Minority's claim is based on the equity in the Debtor corporation, since it arises from the value of the shares which are being bought out. Thus the value is the liquidation value.[6]  The amount that should have been awarded by the Superior Court is what the Minority would have received had their involuntary dissolution action been allowed to proceed to conclusion.[7]  The sale expenses must be taken into account, as well as the sale price and the taxes that would arise from the disposition of the assets.

While the Minority asserts that the value should be that awarded by the Superior Court, it argues, in the alternative, that if this Court feels that there needs to be a new valuation, that value "should be derived from the net going-concern value of the Debtor as of the petition date (as computed from the Debtor's Schedules), which would be $2,512,601.98, plus damages for the diminution in value of the Minority's court-ordered right to payment for its shares."[8]  This arises under the provisions of Cal. Corp. Code §2000(a), which provides in part that the "fair value shall be determined on the basis of the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation."  Because the Debtor has always intended to operate this business as a going concern, the net going-concern value of the Debtor as of the petition date is the proper measure of value.

As with any claim in bankruptcy, the value of Minority's claim should be

---

[6] Cal. Corp. Code §2000.
[7] Brief of Orange County Nursery, Inc. re Procedure for Valuing Minority Claim (doc. 613, p. 5), citing to Brown v. Allied Corrugated Box Co., 91 Cal.App.3d 477, 489 (1979).
[8] Supplemental Brief of the Minority Voting Trust re: Allowance of the Minority's Section 2000 Claim (doc. 621, p. 6).

determined in accordance with the underlying substantive law that gave rise to the claim, in this case Cal. Corp. Code §2000(a).  Section 2000(a) specifies a liquidation value that takes into account the possibility of liquidating by sale of the business as going-concern.  Both Minority and Debtor cite the same standard for applying this sentence of §2000(a):  the dissenting shareholders should receive "the liquidation value they would have received had their dissolution action been allowed to proceed to a successful conclusion."  <u>Trahan v. Trahan</u>, 99 Cal. App. 4th 62, 75 (2002); *see also* <u>Brown v. Allied Corrugated Box Co.</u>, 91 Cal. App. 3d 477, 489 (1979).  Had the Debtor been dissolved under §2000, a going-concern sale of the Debtor would have maximized the return to all shareholders and would undoubtedly have been sought by all parties involved.  (Although, as the Debtor points out, determining what dissenting shareholders would have received in a "going concern" liquidation does require the deduction of any costs of a going-concern sale from the going-concern valuation.)  As the Debtor has continued to operate its business as a going-concern, a going-concern valuation is also consistent with notions of fair play and equity.

The state court judgment did value the debtor using a going concern methodology, but did so several months prior to the petition date.  (The Minority also cites the asset and liability values in the Debtor's schedules, but these do not value the Debtor's business as a going concern.)  Given that the issues of valuation may never prove relevant, the parties may wish to avoid the expenditure of substantial time and money that would be required for a full evidentiary hearing resolving this possibly hypothetical issue.  If the parties wish to stipulate to the value of the Minority's claim, the Court invites them to do so in the next 30 days.  Otherwise, the Court will use the state court judgment as a starting point for valuing the Minority's claim and continue this

matter for an evidentiary hearing updating that valuation to the petition date and deducting relevant expenses of a going-concern sale.

### **Ruling**

The Minority's claim is hereby subordinated pursuant to 11 U.S.C. §510(b). The Minority's claim is to be valued based on the going-concern value of the Debtor as of the petition date. This matter will be continued until October 9, 2012 at 10:00 a.m. for a status conference to set an evidentiary hearing on the value of the Minority's claim, which will update the state court valuation to the petition date and deduct relevant expenses of a going-concern sale.

###

DATED: September 4, 2012

_____
United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): )**  MEMORANDUM OF OPINION REGARDING THE TREATMENT AND VALUATION OF THE CLAIM OR INTEREST OF THE MINORITY VOTING TRUST**
_____
was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner stated below:

**1.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** – Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of (*date*)_____, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below.

David Kupetz Email: dkupetz@sulmeyerlaw.com
Elissa Miler Email: emiller@sulmeyerlaw.com
Steven Werth Email: swerth@sulmeyerlaw.com
Tamar Kouyoumjian Email: tkouyoumjian@sulmeyerlaw.com
Brian Fittipaldi Email: brian.fittipaldi@usdoj.gov
Dean G. Rallis Jr. Email: drallis@sulmeyerlaw.com
Leib Lerner Email: leib.lerner@alston.com
Brian Byun Email: bbyun@cooley.com
Donald Dunning Email: ddunning@dunninglaw.com
Janet Gertz Email: jgertz@cooley.com
Ali M. Mojdehi Email: amojdehi@cooley.com
Randall Mroczynski Email: randym@cookseylaw.com
Randy Orlik Email: rorlik@coxcastle.com
Mark D. Poniatowski Email: ponlaw@ponlaw.com
Peter Susi Email: peter@susiqura.com
Andrew Whatnall Email: awhatnall@daca4.com

☐ Service information continued on attached page

**2.  SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:

**Orange County Nursery, Inc.** 5069 Maureen Lane Unit A Moorpark, CA 93021

☐ Service information continued on attached page

**3.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by United States mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following persons and/or entities at the addresses, facsimile transmission numbers, and/or email addresses stated below:

☐ Service information continued on attached page