

**FILED & ENTERED**

**JUL 17 2013**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY** Harraway **DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SAN FERNANDO VALLEY DIVISION

In re:

Orange County Nursery, Inc.

Debtor(s).

Case No.: 1:09-bk-22100-GM

CHAPTER 11

**MEMORANDUM OF OPINION DENYING REORGANIZED DEBTOR'S MOTION FOR RECONSIDERATION (Docket #688)**

Date:   September 24, 2013
Time:   10:00 a.m.
Courtroom:   303

Orange County Nursery, Inc., the reorganized debtor herein (Debtor"), brings this motion for reconsideration (the "Motion") of this Court's:

1. Order Regarding Motion of the Minority Voting Trust to Reconsider Treatment and Value of its Claim re: Subordination and Priority (Docket # 680; Exhibit 4 to the Motion, the "November Order"); and

2. Supplemental Memorandum of Opinion on Motion of the Minority Voting Trust to Reconsider Treatment and Value of its Claim re: Subordination and Priority

-1-

[Docket #652] (Docket #679; Exhibit 3 to the Motion, the "November Memorandum" and, with the November Order, the "November Rulings").

The November Order and the November Memorandum in turn arise from the motion for partial reconsideration by the Minority Voting Trust (the "Minority") of this Court's:

1. Order Regarding the Treatment and Valuation of the Claim or Interest of the Minority Voting Trust and Order Setting Hearing to Schedule an Evidentiary Hearing (Docket #648; Exhibit 2 to the Motion, the "September Order"); and

2. Memorandum of Opinion Regarding the Treatment and Valuation of the Claim or Interest of the Minority Voting Trust [Docket #592] (Docket #647; Exhibit 1 to the Motion, the "September Memorandum" and, with the September Order, the "September Rulings").

I will not restate the factual background, which is set forth in some detail in the September Memorandum and the November Memorandum, but instead will go straight to issue at hand: whether the November Ruling should be amended under Fed. R. Civ. P. 59(e) (as made applicable to bankruptcy proceedings under Fed. R. Bankr. P. 9023). More specifically, was the Court's ruling that the Minority's claim not be subordinated pursuant to Bankruptcy Code §510(b) based on a manifest errors of law?

This Court's decision in the November Rulings not to subordinate the Minority's claim relied on an analysis of the dual policy rationales behind mandatory subordination under §510(b): "1) the dissimilar risk and return expectations of shareholders and creditors and 2) the reliance of creditors on the equity cushion provided by shareholder investment." Am. Broad. Sys. v. Nugent (In re Betacom), 240 F.3d 823, 829-30 (9th Cir. 2001). As this Court stated in the November Rulings:

> The Minority is correct that its subordination to other creditors negates at least

    some portion of one policy rationale for §510(b): protecting the expectations of creditors who relied on equity when extending credit to the Debtor and fairness to them in enforcing the absolute priority rule.  With the Minority subordinated to other creditors, no creditors will be harmed by the Minority's elevation to debt.

    Protection of other equity could also be a policy rationale for Section 510(b), which ordinarily operates in a way that protects both creditors and other equity holders from some equity seeking to recover its investment as debt.  However, none of the §510(b) precedent relied upon by this Court offers protection of equity as a rationale and this case law already takes an expansive view of §510(b).  I am reluctant to further expand §510(b)'s reach to protect equity, in the absence of some supporting authority.

    The risk allocation policy rationale for §510(b), i.e., whether the Minority had the risk and reward expectations of a creditor or equity, takes a different, more abstract perspective on the question of fairness.  Rather than harm to others, this rationale focuses on whether, given the Minority's risk/reward allocation, repaying it as debt would confer an unfair advantage on it.  "The creditor can only recoup her investment; the investor expects to participate in firm profits." Betacom, 240 F.3d at 830.

    The Minority's expectations were not entirely fixed on the petition date, as the Minority argues.  But, as discussed in detail in the preceding section, at that instant in time the Minority had mixed debt and equity expectations that it did not control.  It could be paid as debt at the debtor's election and would in all likelihood not participate in the Debtor's profits if there were profits to participate in.  It had effectively lost "the primary benefit of [stock] ownership: the potential for upside."

November Memorandum at 11-12.

Motion   The Motion sets forth the factual background and argues that the Court made three manifest errors of law in the November Rulings:

1. The court mistakenly relied on two policy rationales to preclude application of §510(b) to the claim that clearly fell within the plain language of §510(b) and the Ninth Circuit's expansive reading of §510(b) in Betacom.

2. The Minority's claim is not subordinated to other creditors as a matter of state law, so one of the policy rationales -- protecting other creditors who may have relied on the equity cushion provided by shareholder investment – is present and supports subordination.

3. Even if the Minority has a claim, it is not an allowable claim because it cannot be enforced.  California law provides that corporations are not required to buy the shares of a minority to avoid dissolution.

<u>Opposition</u>   The Opposition argues that the November rulings were correct because:

1. California law does subordinate the Minority's claim to the claims of other creditors, so the creditor protection rationale for subordination remains inapplicable.

2. The Court's use of the dual policy rationale's was consistent with the Ninth Circuit's expansive reading of 510(b) in <u>Betacom</u>, which applied these rationales, and also with the Ninth Circuit's adoption of the "causal nexus" test in <u>Racusin v. Am. Wagering, Inc. (In re Am. Wagering, Inc.)</u>, 493 F.3d 1067 (9th Cir. 2007).  The policy rationale's were used by the Ninth Circuit to help interpret the ambiguous language of §510(b).

3. Even if §510(b) is applied to the Minority's claim, the Minority's claim will heavily dilute the Majority's equity because the amount of the Minority's claim will be based on petition date values and value of the debtor's equity has substantially declined since the petition date.

4. The Minority's claim is enforceable under California law and, in any event, the Motion asks for reconsideration of the November Rulings, which did not assess allowance of the Minority's claim.

<u>Reply</u>  Debtor's reply attached a recent decision, <u>O'Donnell v. Tristar Esperanza Props., LLC (In re Tristar Esperanza Props., LLC)</u>, 488 B.R. 394 (B.A.P. 9th Cir. 2013), and argued that:

1. <u>Tristar</u> subordinated a claim arising from a LLC's compulsory buy-back of a membership interest under the terms of the LLC's operating agreement and it is not factually distinguishable from this case for the purposes of §510(b).

2. The November Rulings are erroneously based on the dual policy rationale behind §510(b) rather than the statute itself, although both policy rationales are present in this case.

3. The Minority is not subordinated to other creditors under state corporate law, so creditor protection does justify §510(b) subordination.

4. The Minority's claim is rooted in equity, which is all that Tristar requires for the equitable risk/return expectations rationale to justify mandatory subordination. Tristar determined the equitable nature of the investment, not as of the petition date, but as of some date well before the petition was filed.

Interim Order   After the reading the Tristar decision, the Court issued an interim order allowing both the Minority and the Debtor to submit further briefing on Tristar and its effect on timing, given that it is on appeal to the Ninth Circuit. Both the Minority and the Debtor filed such supplemental briefs.

Minority's Supplemental Brief   The Minority argues that:

1. Tristar is distinguishable because in that case the Debtor was *compelled* to buy back the interests, whereas here the Debtor had control – it could elect to buy back Minority's stock or face dissolution.

2. The BAP approach in Tristar is arbitrary, it looks before the petition date to determine the equitable nature of an investment, but does not say how long to look back before the roots in equity become "old and cold." Tristar says 8 months is not enough (although it was actually 2 years and 8 months since the notice that compelled buy-out). The Promissory Note cases, such as

Burtch v. Gannon (In re Cybersight), 2004 WL 2713098 (D. Del. 2004), which focus on whether shareholders had irrevocably traded their rights to potential upside by the petition date, are less arbitrary, more equitable and better reasoned than Tristar.

3. Decisions of the BAP, such as Tristar, are not binding on this Court.

4. The second rationale for mandatory subordination under §510(b) remains inapplicable because the Minority is subordinated to other creditors.

Debtor's Reply to Minority's Supplemental Brief  The Debtor argues that:

1. Tristar is a proper application of the Ninth's Circuit's expansive view of §510(b) – which asks only whether there is a causal link to equity. Under Tristar, the Court should look at the Minority's roots in equity, rather than just considering their status at the petition date.  The promissory note cases cited by the Minority are inconsistent with Ninth Circuit precedent.

2. The Minority is not "intermediately" subordinated to other creditors under state law, so creditor protection still justifies §510(b) subordination.

3. Under Tristar, only one of the two rationales need be present for §510(b) mandatory subordination.

4. Tristar is not distinguishable from this case.  The Minority cites Debtor's control over the Minority's treatment but this distinction is not relevant to §510(b).  The Minority is forced to argue that Tristar is incorrect and should not be followed, because the present case is not distinguishable from Tristar.

5. Arguing whether Tristar is binding on this court misses the point: Tristar should be followed because it is persuasive – it is the correct application of Ninth Circuit precedent.

In response to the Court's question regarding the timing effect of the pending appeal to the Ninth Circuit of the TriStar decision, Debtor cites several Ninth Circuit documents that collectively indicate that the Ninth Circuit decision should be expected between one and two years from now.

Analysis

Under Fed. R. Civ. P. 59(e) (as made applicable to bankruptcy proceedings under Fed. R. Bankr. P. 9023), a judgment may be amended if, *inter alia*, it is based on a clear error or there is an intervening change in controlling law. S*ee, e.g.,* McDowell v. Calderon, 197 F.3d 1253, 1255 (9th Cir. 1999).

Manifest errors of law

The Motion has not persuaded me that the November Rulings were based on any clear errors. Debtor argues that this Court was mistaken in using the twin policy rationales from Betacom to determine whether a claim should be subordinated under §510(b). Debtor is incorrect. The ambiguous language of §510(b) has led a number of courts, starting with the Ninth Circuit in Betacom and mostly recently the Ninth Circuit BAP in Tristar, to employ these rationales to determine the reach of §510(b).

Debtor and Minority have devoted substantial time and paper to arguing whether state corporate law requires that the Minority's claim has an "intermediate status" between other creditors and equity.  (The issue probably has required such lengthy

briefing because it is not crystal clear.)  However, arguing what should happen under state law misses the point of what has already happened in this case.  Debtor's confirmed plan of reorganization effectively subordinates the Minority to unsecured creditors.  The Plan was not stayed as to Class 4 (General Unsecured Creditors) and above.[1]  Class 4 is to be paid in full under the Plan and, according to Debtor's Fourth Post Confirmation Status Report (Docket 585), the Debtor has paid Class 4 approximately 88% as of April 2012.  With unsecured creditors already paid or close to being paid in full under the Debtor's confirmed plan, protecting the expectations of creditors rationale does not justify mandatory subordination

Because the allowability of the Minority's claim was not the subject of the November Rulings that are under reconsideration in this Motion, I will not entertain Debtor's argument that the Minority does not have an enforceable claim.

Tristar:  An Intervening Change in Law

Ninth Circuit precedent under Fed. R. Civ. P. 59(e) also allows for amendment of a judgment based on intervening changes in the law and the 9th Circuit BAP's decision in Tristar appears to be just that.   The facts of this case and those of Tristar are remarkably similar: both involve a court ordered buy-back of equity arising out of proceedings commenced a few years before bankruptcy, which ultimately triggered the bankruptcy filing.  Tristar was a California LLC that was required to repurchase a 14% membership interest under the terms of its operating agreement.  This obligation was triggered by a notice of withdrawal given in 2008, which led to an appraisal (the value of

---

[1] The Minority appealed and ultimately obtained a partial stay of the confirmation order.  There was no stay for the unsecured creditor class (Class 4 Claims) and higher.  But the treatment of Classes 5, 6 and 7 (essentially all claims and interests of equity holders) has been stayed.

-8-

which was disputed by the Debtor), an ensuing arbitration that concluded in 2010, and the judicial confirmation of the arbitration award and reduction of the arbitration award to judgment, also in 2010. The Debtor commenced Chapter 11 in August 2011. The BAP concluded that "the buy-back transaction was a disputed issue until shortly before the chapter 11 case was filed and was, doubtless, a material factor in the need for chapter 11 relief." 488 B.R. at 404.

The November Rulings looked at the rights of the Minority *at the petition date* to determine their risk/return profile and thus whether they should be subordinated as a matter of equity. Tristar looked well before the petition date and, relying on American Wagering, asked simply whether there was a causal nexus between the claim and equity:

> Applying the two rationales underlying § 510(b) to the facts presented here, we conclude that the appellants' claim is subject to mandatory subordination. O'Donnell was in fact an equity holder before she withdrew. During her tenure as a member of Tristar, she enjoyed the potential for profit based on the value of real estate. In fact, she enjoyed a considerable return: she contributed $100,000 initially and received an arbitration award for nearly $400,000. The confirmed arbitration award is directly linked to her ownership of a membership interest in the debtor; indeed, it is nothing other than her cashing out her equity (at a value that the debtor insists is highly inflated).

488 B.R. at 403. Applying this standard, the Minority's claim should also be subordinated. Their claim is also based on a state court judgment directly arising out of their equity in the Debtor.

The BAP acknowledged that at some point the link to equity could become so

"old and cold" that subordination would no longer be appropriate, but that was not the case in <u>Tristar</u>. And this case has similar timing. As Minority points out, in <u>Tristar</u> there was about eight months between the judgment and bankruptcy and about two years and eight months between the initiating of the withdrawal and the bankruptcy. In this case, only about two month elapsed between the judgment and bankruptcy, while the Minority had commenced the dissolution action in 2006 (like <u>Tristar</u> between two and three years prior to bankruptcy). Thus, under <u>Tristar</u>, the Minority's roots in equity are not sufficiently "old and cold" to avoid subordination.

Minority attempts to distinguish <u>Tristar</u> on the grounds that <u>Tristar</u> was required to repurchase the ownership interest in question, while Debtor had the option of repurchasing or dissolution. This is a distinction without a difference. Minority has not articulated why this choice or lack of choice is significant. Given that the causal link between equity and the claim is the significant issue, I cannot think why it would matter. (If anything, the Minority's dual equity/debt status makes it closer to equity and an even stronger candidate for subordination.)

Minority argues that <u>Tristar</u> is not binding and that the Court should follow <u>Cybersight</u> and the other promissory note cases as better reasoned precedent. This Court does consider itself bound by the decisions of the Ninth Circuit Bankruptcy Appellate Panel. <u>Life Ins. Co. v. Barakat (In re Barakat),</u> 173 B.R. 672 (Bankr. C.D. Cal. 1994), *aff'd*, 99 F.3d 1520 (9th Cir. 1995). If <u>Tristar</u> were not on appeal to the Ninth Circuit, the Court would follow it as binding precedent. With the pending appeal and consequent lack of certainty of result, the Bankruptcy Appellate Panel decision is not binding. My respect for the BAP and its careful consideration of these issues does mean I view the <u>Tristar</u> opinion with a certain amount of deference, however.

<u>Tristar's</u> focus on the original roots of the claim at issue and the promissory note cases' focus on the status of the claim on the petition date offer two different paths to resolving this issue.  Having spent considerable time on this question, one can say with certainty only that there is compelling analysis behind both views and no clearly superior answer to this question.   What ultimately renders the promissory note approach preferable in this case is the simplicity of the result -- as opposed to the irrational complexity that would result from the application of <u>Tristar</u> and the subordination of the Minority's claim.

Section 510(b) states that subordinated claims arising out of common stock will have "the same priority as common stock."   So, if the Minority's claim were to be subordinated under 510(b), the Plan would need to provide the Minority's claim the same priority as equity.  The Plan currently provides that the Minority's claim is a contingent claim in Class 5B (which also includes a non-contingent claim for Minority's attorney's fees) and that Debtor shall pay Class 5B $5,000 per month.  (The Plan also provides for a liquidation contingency, which is triggered if an appellate court enters a final order holding that the Minority's claim is allowed and has priority over equity, and debtor cannot pay such claim.)  Confirmation Order ¶ 4.  On the other hand, Equity (Class 7) remains after the Effective Date (unless a holder voluntarily cancelled its shares in exchange for its pro rata share of the liquidation value of the Debtor.)  Plan ¶ 7.6.

Difficulty arises in determining the actual mechanics of granting, as §510(b) directs, equal priority to a claim (which is denominated in dollars) and equity (which is denominated in a percentage.)  In many cases the difficulty is avoided because the plan provides that equity and subordinated claims receive nothing on account of their

interests and claims.  In this case, equity is retaining its interest in Debtor, so the only conceivable way to treat the Minority's claim on parity with equity is to distribute some amount of common stock to the Minority on account of its subordinated claim.  *See* Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC), 439 B.R. 284 (S.D.N.Y. 2010); Kaiser Group Int'l v. Pippin (In re Kaiser Group Int'l), 326 B.R. 265, 268 (D. Del. 2005).  The real issue is *how* and *when* to value Debtor's equity to determine what percentage of the Debtor's equity the claim of the Minority should receive.  The case law does not provide guidance on these questions.

In its Opposition, the Minority assumes that the valuation should be some unspecified time well after the petition date and, due to the substantial decline in the value of Debtor's equity since the petition date, the Minority's subordinated claim will heavily dilute the Majority's equity.  Opposition at 8-9.  In essence, the Minority envisions two different valuations:  its 40.25% stock ownership in Debtor would be converted to a claim based on the going concern value of Debtor on the petition date (as the Court has ordered)[2], and subordination of its claim would be effectuated by revaluing Debtor's equity at some later date to determine how much equity the Minority will receive on account of its claim.  The Minority does not specify whether that later date would be the confirmation date or some other date.

Although not briefed, Debtor presumably would argue for a petition date valuation for both liquidating the Minority's claim and then determining how much equity Minority should receive on account of its claim (so that the Minority's ownership percentage in the Debtor would not grow as the Debtor "slimmed down" in reorganization).

---

[2] This Court has previously ruled that the Minority's claim is to be valued based on the going-concern value of the Debtor as of the petition date.  September Order at 2.  The evidentiary hearing on that valuation has been continued to the same date as the hearing on this Motion.

The confirmation date would appear to be the most rational time for valuation for distribution purposes.  It is consistent with the purpose of the valuation – to determine the correct amount of stock to distribute under a plan on account of a claim.  Valuation of debtors for confirmation purposes (such as the "best interests of creditors" test or valuing distributions in the disclosure statements) are generally as of confirmation or shortly beforehand.  However, at least at first glance, this 360-degree conversion of equity into debt as of the petition date and then back into equity as of the confirmation date seems a bit ridiculous and most certainly quite cumbersome..

Conversely, a petition date valuation seems arbitrary and is not consonant with the plan distribution purposes of the valuation.  Its virtue is simplicity – Debtor's equity would be valued on the petition date for all purposes.  But that very simplicity leads to a dubious result: valuing the Debtor at the petition date to determine both the amount of the Minority's claim and then how much equity the Minority should receive on account of that claim effectively eliminates Minority's *claim*. The Minority will retain its 40.25% of equity as though it never had a claim.

Whatever *date* may be chosen, the *method* of valuation to determine stock distributions must also be determined.   A going-concern valuation of Debtor's equity is most likely appropriate.  Because the going-concern value will be used to initially liquidate the Minority's claim, the use of another valuation standard to calculate the stock distributions would lead to inconsistent and arbitrary results.

The foregoing is not meant to be determinative of these issues, but merely to explain the fiendish level of complexity that ensues from subordinating the Minority's claim.  First, the Court must determine the proper timing and method of valuing Debtor's equity for purposes of a stock distribution on account of the Minority's claim.  Next, the

chosen timing and method must be applied in an evidentiary hearing to actually determine that value. If, as is likely, the timing and method are anything other than petition date/going concern, then the Court will need to conduct two separate valuations of Debtor's equity.[3]

Faced with two choices of equal appeal, the Court believes it should elect the alternative that eliminates a substantial amount of needless complexity. *See* MBNA America v. Locke (In re Greene), 223 F.3d 1064, 1073 (9th Cir. 2000)(interpreting Bankruptcy Code and Rules to avoid introduction of a "useless step"); Bonded Fin. Servs. v. European Am. Bank, 838 F.2d 890, 894 (7th Cir. 1988)(same). Accordingly, this Court will elect to follow the Cybersight and other promissory note cases and consider the nature of the Minority's claim at the petition date for §510(b) purposes. Thus, for the reasons expressed in the November Rulings, the Minority's claim will not be subordinated under §510(b). Another Court could very reasonably reach the opposite result (as the BAP has done in Tristar), so this decision may well be reversed on appeal. It is also possible that the Ninth Circuit will rule on Tristar before the appeals

---

[3] And if, as the Minority believes, the value of Debtor's equity has declined substantially since the petition date, the ultimate effect of subordination and this complicated two-step valuation may be very similar to the result if the Minority's claim were never subordinated. This would result in a very expensive trip around the block for both parties. And if, as the Minority believes, the Majority's stock would be substantially diluted as a result of the Debtor's decline in value, the Minority could become the Majority and take control of the Debtor and of this bankruptcy. The Plan might be withdrawn years after its confirmation and the case sent into disarray.

on this litigation are finally resolved. But any further litigation in *this* Court on *this* issue would only be a waste of time and money for both parties.

<u>Ruling</u>: Motion for reconsideration is DENIED.

###

Date: July 17, 2013

Geraldine Mund
United States Bankruptcy Judge

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*): Memorandum of Opinion Denying Reorganized Debtor's Motion for Reconsideration was entered on the date indicated as 〝Entered〞on the first page of this judgment or order and will be served in the manner stated below:

**1.SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)** B Pursuant to controlling General Orders and LBRs, the foregoing document was served on the following persons by the court via NEF and hyperlink to the judgment or order. As of July 17. 2013, the following persons are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email addresses stated below.

Randolph A Bain    , efilings@amlegalgroup.com
Brian W Byun    bbyun@cooley.com
Donald T Dunning    ddunning@dunninglaw.com, jmacleod@dunninglaw.com
Brian D Fittipaldi    brian.fittipaldi@usdoj.gov
Janet D Gertz    jgertz@cooley.com
David S Kupetz    dkupetz@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com
Leib M Lerner    leib.lerner@alston.com
Elissa Miller    emiller@sulmeyerlaw.com, asokolowski@sulmeyerlaw.com;atty_walker@bluestylus.com
Ali M Mojdehi    amojdehi@cooley.com, jgertz@cooley.com;bbyun@cooley.com;arego@cooley.com
Randall P Mroczynski    randym@cookseylaw.com
Randy P Orlik    rorlik@coxcastle.com
Mark D Poniatowski    ponlaw@ponlaw.com
Lorraine M Sarles    lorraine.sarles@alston.com
Peter Susi    cheryl@susigura.com, peter@susigura.com
Tamar Terzian    terzian@kingobk.com
United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
Steven Werth    swerth@sulmeyerlaw.com, asokolowski@sulmeyerlaw.com;slee@sulmeyerlaw.com
Andrew F Whatnall    awhatnall@daca4.com

☐ Service information continued on attached page

**2.  SERVED BY THE COURT VIA UNITED STATES MAIL:** A copy of this notice and a true copy of this judgment or order was sent by United States mail, first class, postage prepaid, to the following persons and/or entities at the addresses indicated below:

Orange County Nursery
5069 Maureen Lane Unit A
Moorpark, CA 93021

☐ Service information continued on attached page

**3.  TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an AEntered@ stamp, the party lodging the judgment or order will serve a complete copy bearing an AEntered@ stamp by United States mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following persons and/or entities at the addresses, facsimile transmission numbers, and/or email addresses stated below:

☐ Service information continued on attached page